### UNITED STATES DISTRICT COURT
### DISTRICT OF SOUTH CAROLINA
### CHARLESTON DIVISION

| | |
|---|---|
| RACHAEL MANEY, | |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| v. | Demand for Jury Trial |
| MASON PREPARATORY SCHOOL, | Civil Action No. 2:19-cv-02899-BHH |
| Defendant. | |

### FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL

1.    Plaintiff Rachael Maney brings this action against Mason Preparatory School for declaratory judgment, injunctive relief, and damages for discrimination and retaliation in violation of 42 U.S.C. § 1981, for breach of contract, and for negligence.

### NATURE OF THE ACTION

2.    Plaintiff Rachael Maney complained to Mason Preparatory School ("MPS" or "School") officials on a number of occasions that one of her son's teachers was engaging in racially motivated, inappropriate conduct and creating a racially hostile environment in the classroom. When the School finally opened an investigation, Ms. Maney's complaints were confirmed and the investigator's report led to the termination of the teacher, Carol Maynard, for cause and placement of Head of School Erik Kreutner on administrative leave.

3.    The other parents in the School reacted to the School's actions with anger, coming to the defense of the fired teacher and launching a barrage of attacks on Ms. Maney for raising the now-confirmed issues about Maynard's misconduct. The Interim Head of School, Michael Green, capitulated to the baseless outrage of the other parents and retaliated against Ms. Maney.

Without warning or notice, the temporary Head of School forced Ms. Maney and her children out of the School.

4.     The expulsion letter, which contained a directive to never to return to School grounds or speak with School employees, had no factual basis and was premised on unfounded statements about Ms. Maney, whom the Interim Head of School has never met. Ms. Maney was a valued member of the school community and had always had good relationships with School officials and teachers. She had raised her concerns about the hostile and racialized behavior of the teacher in an appropriate and respectful manner. Her children, an eighth grader and a first grader, were accomplished students who garnered numerous awards and honors during their time at MPS and were regularly praised and commended by their teachers and administration.

5.     Defendant's actions to expel the Maney family from School grounds in response to Ms. Maney's raising well-founded concerns regarding Maynard's creation and maintenance of a racially hostile environment at the School constitute unlawful retaliation and breach of contract. Defendant's actions in permitting a racially hostile environment at the School constitute discrimination in the making and enforcement of the contract between Ms. Maney and MPS. Defendant's unlawful actions against Ms. Maney resulted from the School's negligent supervision and training of its employees and agents. Accordingly, Plaintiff seeks declaratory and injunctive relief as well as compensatory damages stemming from Defendant's violations of 42 U.S.C. § 1981, breach of contract, and negligent supervision and training of its employees.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343(a), 1367, and 2201.

7.    Venue is proper in the District of South Carolina pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

### I.    Plaintiff

8.    At all times material to the allegations herein, Plaintiff Rachael Maney resided in Charleston County, South Carolina with her minor children, P.M. and W.M. Ms. Maney is a Korean-born, naturalized American citizen. Her sons P.M. and W.M. are of Korean descent. At all times material to the allegations contained herein, Ms. Maney was a party to School enrollment contracts with MPS for the education of her children. During the 2018-2019 school year, P.M. was enrolled pursuant to a contract with the School in the eighth grade and W.M. was enrolled pursuant to a contract with the School in the first grade.

9.    Under the terms of the enrollment contracts, various handbooks and documents, and School policies and practices, the School owed a duty to Ms. Maney to educate and care for her minor children, to treat them fairly and protect them from harm, and to provide to them all benefits, privileges, terms, and conditions of the contractual relationships. The School separately owed the Maney children a duty of care based on the school/pupil relationship while the children were in school and participating in School events.

### II.    Defendant

10.    Defendant MPS is a K-8 private school located at 56 Halsey Boulevard, Charleston, South Carolina. The School was incorporated in 1964. The School's enrollment is approximately 275.

3

11.    The School's acts and omissions include the acts and omissions of its Board of Trustees, its Board members, its employees, and its agents, and the School is responsible for the acts and omissions of those individuals.

## FACTUAL BACKGROUND

### I.    Background of MPS

12.    MPS asserts in its mission statement that the School "is committed to the education of the whole child in preparation for secondary education through the cultivation of respect, integrity, and personal responsibility within a nurturing environment that results in a productive citizen of a global community." In reality, the School was founded in 1964 on principles of racism and exclusion.

13.    South Carolina has a long history of resistance to the integration of its schools. The legal challenge to South Carolina's "equalization program" – which had created separate schools for African-American school children – was one of four consolidated cases decided by the Supreme Court in *Brown v. Board of Education* in 1954. Despite the Supreme Court's ruling in *Brown v. Board*, declaring racial segregation in schools unconstitutional, South Carolina's public schools remained segregated for nearly a decade following the ruling.

14.    In 1963, eleven African-American students enrolled in Charleston County's public schools, making South Carolina the last state in the union to desegregate its school system. The following year, numerous private "segregation academies," including MPS (through its two predecessor schools) were founded with the explicit purpose of allowing white families to send their children to all-white schools. Approximately 200 segregation academies were founded in the state over the next decade, allowing South Carolinians to maintain a segregated education system.

15.    MPS has defended its *de jure* segregationist philosophy. When the use of state monies to fund segregation academies was challenged in federal court, MPS voluntarily intervened as a defendant, arguing that the School was entitled to public funds to provide a white-only education.  *See Brown v. South Carolina State Bd. of Educ.*, 296 F.Supp. 199 (D.S.C. 1968).

16.    The School has maintained its *de facto* segregationist philosophy, and has not provided, encouraged, or supported diversity in its community, curriculum, or leadership and personnel since its founding. Upon information and belief, in its 55-year history, MPS has never had a non-white member of its Board of Trustees and has never employed a non-white person as an administrator, educator, counselor, or assistant or support staff member (other than as a custodian).

17.    Upon information and belief, Head of School Kreutner recently suggested that the School was not ready for "Title I" teachers, referencing an African-American potential candidate and the federal funding program for schools with concentrations of low-income students.

18.    The School's current student body is approximately 97% white. Charleston County, by contrast, is only 65% white. Several minority families have recently been enrolled for short periods of time, leaving after negative experiences at MPS.

19.    The immediate past president of the School, John Horlbeck, posed in a 1977 photograph dressed in a full KKK garb staging a mock lynching of his sole African-American college classmate. When the photograph resurfaced and was published in 2019, Horlbeck downplayed its violent, racist imagery of an extrajudicial execution and merely stated "[i]n retrospect, that was probably not a good decision."

II.    **Maney Family's Enrollment at MPS**

20.    In 2012, Ms. Maney enrolled her oldest child, P.M. in the second grade at MPS. P.M. remained enrolled at MPS for the next seven years.

21.    When Ms. Maney's younger son, W.M. reached the age for kindergarten, Ms. Maney enrolled him at MPS. Ms. Maney signed a separate enrollment contract for W.M.

22.    For the first six years of P.M.'s enrollment in the School, Ms. Maney was a supporter and a proud member of the School community. She served as a room parent for W.M.; supported the School's Parent-Teacher Organization and the MPS Foundation; assisted the School's administration, faculty and staff; volunteered at numerous School events; was chosen as a featured speaker at School assemblies to talk about integrity, overcoming challenges, and goal setting; and was named a member of the School's Blue Ribbon Panel by the Director of Guidance and Administration for two years.

23.    P.M. excelled at the School. He was on the Headmaster's List for having straight As for every single year of his seven-year enrollment; was nominated by his fellow students and chosen by the School to be a Peer Mediator (one of four per grade); received the National Junior Honor's Society award for 1) academic excellence, 2) outstanding conduct and behavior, 3) leadership, 4) attendance, 5) citizenship, and 6) character; served as the Keynote Speaker for the 2019 National Junior Honor's Society induction ceremony; was a Le Grand Concours Medalist for two years; received numerous "Nice Knight" awards for kindness, character, and good behavior, and numerous subject academic awards; and received direct and personal commendations from his teachers, the Assistant Head of School Roseann Jordan, and Head of School Kreutner for his honesty, integrity, and character.

24.     W.M. was a beloved member of the first grade, had an unblemished disciplinary record and a successful academic year.

### III.    Maynard's Treatment of P.M.

25.     Throughout his eighth-grade year, P.M. suffered mistreatment by Maynard. P.M. was routinely targeted for criticism, singled out in class, excluded from participating in class, and wrongly blamed for the misbehavior of other students.

26.     Beginning in October 2018, Ms. Maney brought the mistreatment of P.M. to the attention of the School, including to Kreutner and Jordan.

27.     In December of 2018 and the months following, Ms. Maney was informed by several concerned faculty members that Maynard had made racially disparaging statements about P.M. to other teachers and staff. Specifically, Ms. Maney was informed that Maynard had stated that 1) P.M. "has psychological problems because of the color of his skin" and 2) P.M. should attend school "with his own kind."

28.     On information and belief, Maynard's racially pejorative comments about P.M. were numerous, routine, and directed to and heard by other teachers and staff.

29.     Ms. Maney contacted the Chairman of the School's Board of Trustees, as well as Kreutner, to report what she had been told about Maynard's racially disparaging statements. Upon information and belief, the School took no action in response to her complaint to the Chairman of the Board, and Kreutner confirmed that such statements had been made by Maynard, but minimized their significance as merely "generational."

30.     The harassment of P.M. by Maynard continued and Ms. Maney reported further incidents of bias and harassment of P.M. to Kreutner and Jordan.

31.     In January of 2019, School administrators finally acknowledged that they had a problem with Maynard's misconduct and suggested that they would monitor Maynard in her classroom every day, "at all times." They did so for three days. When the observation ended, the mistreatment of P.M. by Maynard continued. Upon realizing the School could not manage the administrative supervision they promised and thought was necessary, Kreutner suggested that he wiretap the classroom as a way to monitor Maynard's misconduct.

## IV.     The Creation and Maintenance of a Discriminatory Environment

32.     Long prior to Ms. Maney's reports, the School had been on actual and constructive notice of Maynard's insensitivities to race, ethnicity, and other issues related to students' protected characteristics, and her creation of hostile environments for children with diverse characteristics.

33.     Other teachers heard Maynard comment on students' races, ethnicities, and complexions. One teacher reported that Maynard often talked negatively about "diverse" kids and how they should attend school with "their own kind."

34.     Maynard's middle school literature curriculum had been unchanged for decades and was focused on works that included the word "nigger." On information and belief, the word was used so often and openly in her classroom that her students were directly impacted: some began using the word to each other, and others were made uncomfortable.

35.     White students discussed the fact that Maynard often said "nigger." For example, in the spring of 2017, one of her students wrote to another student: "*cuz like they prob be spitting out the n word as much as dr maynard*."

36.    The racially hostile environment infected and emboldened students who routinely made explicitly racist comments to P.M., and saw nothing inappropriate with writing highly racialized comments in his yearbook. One student wrote in P.M.'s yearbook:

*"You are my best Asian friend. In fact, my only Asian friend. I am sorry for being racist to you in the past couple of years, but you are starting to show your inner whiteness."*

37.    Other students also wrote inappropriate comments about P.M. in the yearbook, including calling him "Kim-Jung-un," and using the pejorative phrase "*Ching Chang Chong*."

38.    The 2018-2019 Eighth grade class photograph that the School chose to publish in the Yearbook has a white child flashing a "white power" hand gesture in front of P.M.'s shoulder. The publication of the photograph came just weeks after the accused Christchurch, New Zealand shooter, white supremacist Brenton Tarrant, flashed the same "white power" symbol when he appeared in court for killing at least 50 people in two mosques.

## V.    The School's Response to Ms. Maney's Complaints

39.    Ms. Maney's persistence to ensure that some action was taken to address the serious concerns about Maynard's conduct and how it was affecting her son forced MPS to respond.

40.    On or about January 28, 2019, the School placed Maynard on administrative leave in response to the complaints and information provided by Ms. Maney. The School subsequently retained John Emerson, a former general counsel to the Charleston County School District, to conduct an independent investigation of Maynard. The School expressly

acknowledged that the investigation was sparked by the Board's receipt of serious complaints of inappropriate comments by Maynard, which Ms. Maney had been presenting for weeks.

41.    After Emerson completed some portion of his investigation he gave a preliminary report to the School. The School asked Emerson to examine additional matters of concern, suggesting that what Ms. Maney observed and heard was less than the full extent of inappropriate conduct by Maynard. Emerson ultimately concluded his investigation and produced a report with recommendations that he provided to the School. The School refused (and continues to refuse) to release the report or any details of the findings to members of the School community affected by Maynard's misconduct. MPS parents, like Ms. Maney, are unable to address the effect of any of Maynard's misconduct toward their children because the School has not revealed what misconduct was discovered through the investigation.

42.    On March 29, 2019, the School announced that, based on the findings in Emerson's report, "changes must be made at Mason Prep." The School terminated Maynard for cause, and Head of School Kreutner was placed on administrative leave for the remainder of the school year. The School explained that it placed Kreutner on leave in order to "protect" him and the School.

43.    The School continued by noting that changes would begin with faculty, administrators, and Board members by undertaking diversity training. The School also acknowledged that its curriculum needed to be evaluated and expanded.

44.    After the School's announcement of the actions resulting from Emerson's investigation, the School held three parent forums with attendance and participation by the

10

Board of Trustees and the School's attorney. The Board members refused to give specific details of the investigation or the precise basis for the School's decision to terminate Maynard or Kreutner's leave of absence. Instead, the School's attorney, Shawn Wallace, stated publicly during one of the parent forums that the investigation produced evidence of conduct that was similar to the concerns Ms. Maney had raised and that the additional conduct was "much worse." The School attorney did not inform parents what children were affected or how children were affected by the much worse conduct.

45.    Parents attending the forums blamed Ms. Maney for Maynard's departure and attacked Ms. Maney in derogatory and offensive terms. Those attacks continued on social media. The parents faulted Ms. Maney for raising concerns that were confirmed by the independent investigation and led to the dismissal of Maynard. The parents questioned Ms. Maney's motivations and made baseless accusations of unlawful conduct.

46.    At least two School Board members (who had no first-hand familiarity or experience with Ms. Maney or her children) campaigned against Ms. Maney and in favor of Maynard by speaking directly to other parents, stating that Ms. Maney was a "liar" and that the allegations against Maynard were false.  These Board members implied that they had superior and confidential knowledge from their role as Board members, and spread false rumors within the School community that Ms. Maney was merely out to hurt the School.

47.    At least one School Board member encouraged parents to file a lawsuit against Ms. Maney for negatively impacting the school year. The actions of these Board members greatly impacted others in the School community, destroyed Ms. Maney's previously positive reputation, and created and encouraged open hostility to Ms. Maney and her children.

11

48.    Defendant did nothing to protect Ms. Maney and her children from the hostile environment at the School; to the contrary, and in at least three incidents (including one involving racial bullying), P.M. was subject to disproportionate discipline for minor infractions while his classmates were not disciplined for more major ones.

49.    The hostility of the other parents trickled down to their children and the classrooms, resulting in increased bullying, racial slurs against Asians and hostility against P.M. For example, a kindergartener presented P.M. with a handmade card that said, "I Love You" on one side and "I Don't Like You" on the other; when P.M. playfully asked the child why she didn't like him, the young girl answered (as witnessed by a teacher): "I don't like you because you're a Black person."

50.    In April, W.M. was bullied by a first-grade classmate, who told him that he and P.M. "were liars" and that they had "lied" about the School when their family made the complaints about Maynard. That same day, the classmate's mother was allowed by the School administration to remove W.M. from a classroom and interrogate him about the incident without Ms. Maney's knowledge or permission.

51.    W.M. reported this incident to his mother, who contacted the School and expressed her concern that a parent had been allowed to confront W.M. without her knowledge or approval, and without any School supervision.

## VI.    The School's Retaliation: Maneys Expelled from School Grounds

52.    On the evening of Monday, April 29, 2019, Interim Head of School Michael Green emailed Ms. Maney a letter that accused her of being unsupportive of the School and, effective immediately, forbade her and her children from entering School property and from

12

having any contact with School teachers and staff. The letter came without warning and was a complete surprise to Ms. Maney.

53.     Green gave Ms. Maney the choice between 1) immediate termination of the enrollment contracts for both children, meaning that P.M. and W.M. would be expelled from their grades without promotion, or 2) accepting an "out-of-school, extended-absence instructional program," meaning that the children would have to complete all remaining school work for the year at home without teaching or educational support.

54.     Ms. Maney had never met or spoken to Green.  His expulsion letter was bald, bold, and aggressive and its assertions had no basis in fact or reason. In his letter, Green wrote: "*You have been made well aware that your family's inability or unwillingness to [support the School] has serious consequences.*" This statement was entirely unfounded and false. At no point did MPS or anyone on its behalf discuss any such consequences or admonish Ms. Maney in any way.  Ms. Maney was respectful and appropriate in all of her interactions with MPS and its representatives and employees.

55.     Ms. Maney's main contact with the School, Assistant Head of School Jordan, consistently expressed admiration, support, encouragement, and fondness for Ms. Maney and her children. Jordan had previously stated that Ms. Maney's advocacy for her children was "honest and necessary."

56.     Head of School Kreutner had also acknowledged that Ms. Maney and P.M.'s conduct with the School and teachers was respectful and appropriate and that P.M. deserved praise for "taking the high road" in dealing with Maynard's misconduct. At no time did Kreutner (or anyone else at MPS) ever give Ms. Maney any negative feedback of any kind;

on the contrary, face-to-face interactions with Kreutner and Jordan were always pleasant and polite, with Kreutner expressing support and appreciation for Ms. Maney and her children.

57.     The decision to expel the Maney family had no basis. Only one thing had changed from a few months before when Ms. Maney and her children were considered valuable members of MPS: Ms. Maney had reported Maynard's misconduct and racially pejorative statements. That one act took Ms. Maney from being an integral part of the community to being a pariah. The other families' hostility toward Ms. Maney, which was based on their belief that she was responsible for Maynard's termination, led the School to retaliate against Ms. Maney and expel her and her children.

58.     Ms. Maney requested the School allow W.M., in particular, to continue at the School for the remainder of his first-grade year. W.M. was thriving and his attendance and accomplishments were central to his identity and development.

59.     Ms. Maney recognized that W.M.'s removal from the School before the end of the school year would have a significantly harmful effect on his well-being. Abruptly expelling him from the School would jeopardize his emotional and academic development.

60.     Green refused to allow W.M. to complete the first grade with his class.  The sudden expulsion was a devastating shock to the first grader, who responded with crying fits and sadness. The seven-year-old simply did not understand why he was not permitted to attend school with the teacher and classmates he loved.

61.     The morning after the School expelled Ms. Maney and her children from School grounds, there were additional uniformed City of Charleston police officers escorting students into the School building. Presumably, the increased police presence was requested by the School to further intimidate Ms. Maney and further humiliate her among

the School community. That same day, the Board of Trustees informed the school community stating that Kreutner would be returning to the School before the end of the school year.

62.     On the day of graduation, after seven years at the School, P.M.'s existence at the School was simply washed away: his name was excluded from the list of class graduates, he was left off of the list of recipients of the National Junior Merit Awards, and he was not given academic achievement awards for which he was selected by teachers.

63.     W.M. spent the last month of the school year alone and at home, struggling to complete untaught coursework. He received his school supplies returned to him by mail, along with hand-written cards from his classmates saying that he was loved and dearly missed. His teacher wrote that W.M. was "truly one of the kindest and most well-mannered students I have ever taught." Yet he was barred from School grounds and from having further contact with his teacher.

64.     Debbie Bandy, who taught at MPS from 1995 to 2018, confirms some of the allegations described above. For seven years, Ms. Bandy often complained to Kreutner (and in 2018, directly to Chairman of the School's Board of Trustees Jeremy Cook) about Maynard's conduct, lack of classroom control, antiquated curriculum, and unprofessionalism. Despite the complaints, Kreutner and Cook took no apparent action. Ms. Bandy personally heard Maynard make racially disparaging comments in previous years (including expressing surprise at an Indian student's dark skin and repeatedly commenting that African American transfer students did not fit into the school).

65.     Ms. Bandy taught P.M. in the 6th and 7th grade (and tutored him in the 8th grade), and describes him as an exemplary student and young man: respectful, responsible,

15

and a natural leader. While teaching P.M., Ms. Bandy regularly interacted with Ms. Maney, and describes Ms. Maney as one of her favorite parents and as a team-player who supported teachers and was well liked by them.

66.    After P.M. was excluded from MPS, Ms. Maney hired Ms. Bandy as P.M.'s English tutor. Ms. Bandy, following the standard MPS operating procedure, emailed P.M.'s teachers and the MPS administration to get P.M.'s assignments. Ms. Bandy was shocked when she received an email from the guidance counselor that denied her any educational materials and forbade her from contacting P.M.'s teachers. Ms. Bandy witnessed that P.M. was overloaded with school work with no support or instruction and with less time to complete it than his classmates. According to Ms. Bandy, MPS completely disregarded educational best practices and outright bullied P.M.

67.    Ms. Bandy was so highly respected by the MPS administration and community that after she retired and moved out of state, MPS asked her to return to be the 2019 graduation keynote speaker, an honor she accepted. She was outraged to find that P.M.'s very existence at the school had been obliterated: not only was he not allowed to attend graduation, but also his name was not listed with the graduates on the graduation program and he was not recognized for the state and national academic awards he had earned.

## INJURY TO PLAINTIFF

68.    As a direct and proximate result of Defendant's discrimination, retaliation, and otherwise unlawful conduct as described above, Ms. Maney has suffered and will continue to suffer great irreparable loss and injury including but not limited to humiliation,

16

embarrassment, emotional distress, mental anguish, and the deprivation of the right to make and enforce contracts as is enjoyed by white citizens.

69.     Ms. Maney suffered stress, anxiety, and depression caused by the discrimination, retaliation, and otherwise unlawful conduct. Ms. Maney expended significant out-of-pocket costs related to Defendant's conduct related to her and her children. Ms. Maney did not receive the full benefit of the contract with the School because of the discriminatory environment created, maintained, and tolerated by the School; the School's retaliatory constructive termination of the contracts; and the otherwise unlawful conduct.

70.     Defendant's actions were the proximate cause of Plaintiff's injuries and the injuries of her minor children alleged in this Complaint.

## FIRST CAUSE OF ACTION
### 42 U.S.C. § 1981

71.     Plaintiff realleges and incorporates by reference all of the allegations set forth in paragraphs 1 through 70 above.

72.     Defendant's acts and omissions described herein, which created, maintained, and tolerated a severe and pervasive discriminatory environment to which Defendant was deliberately indifferent, deprived Ms. Maney of her federally protected right to make and enforce contracts free from discrimination on the basis of her and her children's race and national origin.

73.     Defendant's acts and omissions deprived Plaintiff of her rights in the performance, modification, and termination of contracts for the education of her children, and prevented her from the enjoyment of all benefits, privileges, terms, and conditions of

the contractual relationship, including the contractual right to have her children attend school free from discrimination and harassment on the basis of race and/or national origin.

74.     Ms. Maney engaged in protected activity when she reported instances of discriminatory actions against her children and other children in the School that interfered with their rights to attend the School and receive educational instruction in a manner free from discrimination.

75.     Ms. Maney was subjected to adverse action when her family was expelled from School grounds and denied an in-school or otherwise equal education.

76.     The School expelled the Maney family from the School grounds and denied an in-school education in retaliation for Ms. Maney's making reports of discriminatory conduct by School employees and agents, which in part led to the dismissal of a teacher and suspension of the Head of School.

## SECOND CAUSE OF ACTION
### BREACH OF CONTRACT

77.     Plaintiff realleges and incorporates by reference all of the allegations set forth in paragraphs 1 through 76 above.

78.     Defendant's acts and omissions described herein constitute a breach of the contract between MPS and Ms. Maney for the education of her children during the 2018-2019 school year.

79.     Defendant breached its contract with Ms. Maney by, inter alia, refusing to educate Ms. Maney's children as in-school students at MPS, refusing to reveal Maynard's conduct that affected Ms. Maney's children, and otherwise failing to educate her children within a nurturing environment that results in a productive citizen of a global community.

80.     Defendant's breach of contract caused Ms. Maney damages as described above.

### THIRD CAUSE OF ACTION
### NEGLIGENCE

81.     Plaintiff realleges and incorporates by reference all of the allegations set forth in paragraphs 1 through 80 above.

82.     Defendant's acts and omissions described herein constitute negligence in the training and supervision of its employees and agents.

83.     Defendant owed a duty of care to Ms. Maney and her children while they were students in the School and in the sole custody of the School during school hours and after school events throughout the 2018-2019 school year. Schools have a heightened duty of care to their students and their families based on the relationship between the school and its pupils.

84.     Defendant breached its duty of care to Ms. Maney and her children by failing to ensure the safety of P.M. and W.M. and by allowing and aiding its employees in discriminating, retaliating, and engaging in unlawful conduct against Ms. Maney and her children. Defendant's failure to train and supervise its employees caused the discrimination, retaliation, and unlawful conduct against Ms. Maney that resulted in damages.

### PRAYER FOR RELIEF

85.     WHEREFORE, Plaintiff respectfully prays that the Court grant the following relief:

    a.   enter a declaratory judgment finding that the actions of Defendant, as alleged in this Complaint, violate 42 U.S.C. § 1981;

b.  enter a preliminary and permanent injunction barring Defendant from continuing to engage in the forms of illegal discriminatory conduct alleged in this Complaint;

c.  enter a preliminary and permanent injunction directing that Defendant takes all affirmative steps necessary to remedy the effects of the illegal discriminatory conduct alleged in this Complaint and to prevent repeated occurrences in the future;

d.  award compensatory damages to Plaintiff in an amount that would fully compensate Plaintiff for the humiliation, embarrassment, emotional distress, mental anguish, physical injuries, and out-of-pocket costs caused by Defendant's conduct as alleged herein;

e.  award Plaintiff her reasonable attorneys' fees and costs; and

f.  order all other relief deemed just and equitable by this Court.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a jury trial on all claims so triable as of right.

Dated: December 10, 2019

Respectfully submitted,

/s/ Marybeth Mullaney
Marybeth Mullaney (Bar #11162)
1037-D Chuck Dawley Boulevard, Suite 104
Mount Pleasant, S.C. 29464
(843) 588-5587
marybeth@mullaneylaw.net

Reed N. Colfax*
Joseph J. Wardenski*
Relman, Dane & Colfax, PLLC
1225 19th Street, N.W., Suite 600
Washington, D.C. 20036
(202) 728-1888
rcolfax@relmanlaw.com
jwardenski@relmanlaw.com
*pro hac vice

*Attorneys for Plaintiff*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 10th day of December, 2019, a true and correct copy of the foregoing First Amended Complaint was filed and served on all counsel of record using the Court's CM/ECF system.


<u>/s/ Marybeth Mullaney</u>
Marybeth Mullaney